**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 18, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CARTEL ASSET MANAGEMENT, a
Colorado corporation,

     Plaintiff - Appellant-
     Cross-Appellee,

    v.

OCWEN FINANCIAL
CORPORATION, a Florida
corporation; OCWEN TECHNOLOGY
XCHANGE, a division of Ocwen
Financial Corporation; OCWEN
FEDERAL BANK FSB, a subsidiary
of Ocwen Financial Corporation,

     Defendants - Appellees-
     Cross-Appellants.

Nos. 04-1502 & 04-1517
D. Colo.
(D.C. No. 01-F-1644 (CBS))

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

---

Cartel Asset Management ("Cartel") filed suit against three Ocwen entities,

Ocwen Financial Corporation ("Ocwen Financial), Ocwen Federal Bank FSB (the

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

"Bank"), and Ocwen Technology Exchange, Inc. ("Ocwen Technology"). Cartel alleged each entity misappropriated trade secrets and Ocwen Technology also fraudulently induced Cartel to enter into a contract and then breached the contract.[1] After a seven-day trial, the jury returned a verdict for Cartel on the misappropriation claim against the Bank and a verdict against Ocwen Technology for breach of contract and fraudulent inducement. On the misappropriation of trade secrets claim, the jury determined Cartel's actual damages amounted to $4,900,000 and awarded punitive damages in the amount of $3,900,000. The jury concluded Ocwen Technology owed Cartel only $1 in nominal damages for breach of contract, but awarded actual damages of $260,000 and punitive damages of $260,000 on Cartel's fraudulent inducement claim.

Post-trial, the district court determined it should have stricken the testimony of Cartel's damages expert because the testimony was based on speculation. As a result, the trial court ordered a new trial on the issue of damages for all claims and ordered the parties to submit briefs, prior to a scheduling conference, discussing any evidence that may support an alternative damages award. Before the date of the scheduling conference, however, the trial court issued an Order On Pending Motions. The court rejected post-trial motions

---

[1] Cartel also claimed unjust enrichment but this claim was dismissed by the district court at trial. The court determined the damages for unjust enrichment were duplicative of the damages sought for misappropriation of trade secrets. Cartel does not challenge the dismissal of its unjust enrichment claim on appeal.

by the Bank and Ocwen Technology claiming a new trial should also include liability issues. It further denied Cartel's motion for reconsideration of the order granting a new trial on damages. Instead, based on the alternative damages theories and the evidence presented by the parties, the trial court reinstated the breach of contract and fraudulent inducement damages but determined the admissible evidence did not support the proposed damages theory for misappropriation of trade secrets. As a result, the court, *sua sponte*, ordered Cartel to receive only nominal actual damages of $1 and punitive damages of $1 on its misappropriation claim. Given these rulings, the trial court concluded there was no basis for a new trial.

The court also ordered the Bank to pay Cartel's costs and $170,000 in attorneys' fees on the misappropriation claim and ordered Ocwen Technology to pay Cartel's costs as to its breach of contract and fraudulent inducement claims. However, the court ordered Cartel to pay Ocwen Financial's costs in defending Cartel's unsuccessful claim of misappropriation of trade secrets. The court entered a final amended judgment incorporating its determinations on November 4, 2004.

On appeal, Cartel challenges the district court's reduction of the trade secret misappropriation award. First, Cartel contends the absence of an opportunity for a new trial on damages constitutes a forced remittitur in violation of its Seventh Amendment right to a jury trial. Cartel also maintains the damages

award for misappropriation of trade secrets was supported by substantial evidence, including the testimony of its expert. The Bank and Ocwen Technology filed a cross-appeal, challenging the trial court's award of attorneys' fees against the Bank and the entry of judgment in favor of Cartel on its fraudulent inducement claim.

## I.  BACKGROUND

A.  *The Parties*

1.  Cartel Asset Management

Cartel specializes in providing "broker price opinions" (BPO)[2] and appraisal valuations of real property, primarily residential, for lenders throughout the country. A BPO is a property valuation performed by a real estate professional, either a broker or an agent. The agent drives by the property, photographs it, examines public record data, identifies values of comparable residential property, and provides a written estimate of value for the subject property.

Cartel was formed in 1993 in response to the sale of large "pools" or portfolios of nonperforming[3] and foreclosed loans at auction, ranging from 6

---

[2] A BPO is also known as a "comparative market analysis" (CMA). (R. Vol. 8 at 2873.)

[3] A nonperforming loan is a loan that is delinquent in payment for ninety days or more. The goal is to turn the loan into a performing loan. However, if this effort is unsuccessful, the loan goes into foreclosure and becomes a "real estate owned" (REO) loan. (R. Vol. 8 at 2872.) At that time, another BPO is

loans to 700 loans in a pool. (R. Vol. 8 at 2620-21.) Because of the age of the loans and changing local economic environments, the original loan values were not necessarily related to the present value of the pool property. Potential bidders required current property valuations to determine an appropriate cost for the loans in the pool. Due to the short time period between the announcement of the sale and the date of the loan pool auctions, potential bidders needed these current valuations quickly. To meet this need, over the period of five or six years, Cartel developed a national list of real estate agents and brokers willing to perform a BPO within a stated amount of time for a certain fee. Potential bidders, such as banks, would send Cartel the identities of the properties to be valuated. Cartel would then contact a local broker in the area of each property to perform the BPO. The realtor would return the BPO to Cartel, and after a review for quality, Cartel would send the completed BPO to the potential bidder. According to Walter Coats, the CEO and President of Cartel, Cartel paid the local agents approximately $50 to provide the BPO and charged most of its clients $95 to $105 per BPO.

2. The Ocwen Entities

a. Ocwen Financial Corporation

Ocwen Financial Corporation is a holding company based in Florida. It is

---

required and the agent performing the REO property evaluation is likely to get the listing on the property.

the parent company to the two other defendants in this case, the Bank and Ocwen Technology. The Ocwen entities are primarily operated by brothers William and John Erbey. William Erbey was chief executive officer and chairman of the Bank at all relevant times. The Bank's valuation department purchased loan pools requiring updated BPOs. The bulk of its BPOs were purchased through national vendors, such as Cartel, from 1993 through 1999. In 1995, the Bank created a computer system called Order Tracking, in which it kept names of its vendors and followed the progress of its orders.

In mid-1999, the Bank created a new division, Ocwen Realty Advisors (Ocwen Advisors). Bill Krueger, formerly with the Bank's valuation department, was appointed the Director of Ocwen Advisors and was tasked with reorganizing the department. The goal was to transition the valuation department from its status as a historical cost center, providing support to its acquisition department, to a division providing services to clients for a fee.

b. Ocwen Technology

Ocwen Technology was formed to develop and implement an e-commerce platform, REALTrans, to allow seamless financial transactions between customers and vendors. As explained by one national provider,

> "REALTrans is like an electronic pipe. . . . [O]n one side were vendors like myself, BPO providers, many different types of vendors in residential real estate services, flood companies, tax companies . . . . On the other side of the pipe are all the banks, the lenders. . . . REALTrans's function was to help facilitate communications

-6-

between banks who would send orders, and vendors who would complete them. And REALTrans would take a fee for making that transaction happen."

(R. Vol. 7 at 2272.) REALTrans was announced to the Bank's national vendors in late 1998 and implemented in 1999. William Erbey was chairman of the board of Ocwen Technology; John Erbey was the chief executive officer.

B. *History of Business Dealings*

When Cartel was formed in 1993, the national sale of BPOs was a fledgling industry. Coats, along with two other national BPO providers, explained that the development of a database of brokers and agents sufficient to provide a national service was a time-consuming and expensive process. Prior to the advent of extensive internet listings, a national agent list was generated through review of telephone books and industry listings. Even with the available resources on the internet in 2001 to 2003, finding the name of an agent or broker was only part of the process. Further steps in the process required calls to the individual realty professionals to determine their willingness to perform the service at a certain price, eventual use of the individual realtor, and finally, a review and rating of the timing and quality of the realtor's work. If the agent was timely and accurate, the agent was designated as "use." If the agent's work was not satisfactory, the designation was "prevent use." (R. Vol. 9 at 2984-85.) As described by one national provider, once developed, the agent list "is the lifeblood of [the] business." (R. Vol. 7 at 2308.)

Cartel began doing business with the Bank's valuation department shortly after Cartel's inception. As the purchaser of loan pools, the Bank eventually ordered thousands of BPOs from Cartel and other national providers, supplying the national vendors with its own forms for completion of the BPOs. The form included a space identifying the realtor completing the BPO, the realtor's telephone number to be used in the event the Bank needed to clarify any information on the form, and the realtor's professional license number. Several witnesses testified the understanding between Cartel and the Bank was that the names of Cartel's brokers and agents were Cartel's proprietary information.[4] Upon the return of the BPOs to the Bank, the Bank's team of reviewers would analyze the BPOs and other information to determine a value on the loan pool or portfolio.

Commencing in 1995, the Bank's Order Tracking system contained the names of its national BPO vendors and its retail BPO providers used primarily for Bank-owned REO properties.[5] By 1997, the Bank ordered approximately 94% of its residential BPOs from national providers. These orders would be identified in the Order Tracking system under the vendor's name. At point, Cartel

[4] Throughout trial, however, the Bank witnesses contended the Bank unconditionally purchased not only the BPO valuation, but the broker information as well.

[5] A "retail" BPO provider is an agent or broker contacted directly by the Bank to perform a BPO as an initial service and to be the listing agent in the event of a foreclosure sale.

received the lion's share of the Bank's BPO business, approximately 35% of all national BPO orders.[6] For example, in the fourth quarter of 1998, the Bank ordered 16,285 BPOs. Only 417 were ordered from retail providers, while 15,868 were ordered from national providers. Cartel received 7,042 of the Bank's BPO orders in that quarter. (R. Vol. 10 at 3573, 3589.)

In late 1998, Ocwen Technology was preparing to debut its REALTrans system. The product was the foundation for Ocwen's overall corporate objective to increase profits through the use of e-commerce. Prior to REALTrans, the Bank communicated with its vendors by e-mail, telephone and fax. The plan was to integrate the Bank's Order Tracking system and Ocwen Technology's REALTrans program, eventually allowing the Bank to create an order in Order Tracking, assign a vendor and, with the press of a button, engage the REALTrans capabilities. At the other end, the vendor would log on to REALTrans to receive an assignment identifying the product, price and deadlines. Accordingly, in late 1998 and early 1999, the Bank and Ocwen Technology gathered the national providers to explain the process and encourage their participation. Because REALTrans was a desktop system (it later became a web application), the Bank asked the national providers to have their agents sign up on the new product; they would train the agents and the agents could send their BPOs directly to the Bank.

[6] Due to the volume, Cartel's pricing was on the low end of the range through the year 2000. It charged the Bank $75 per BPO, while most national vendors' charge per BPO was between $75 and $100.

Several of the national providers, including Cartel, expressed concern that once their agent information was in the system, the Bank and other lenders would have direct access to their realtor lists and put them out of business. At a December 1998 meeting, William Erbey assured one of the national BPO providers that the Bank was not in the business of providing BPOs or competing with the national providers. At a January 1999 meeting, Krueger and his assistant, Dave Babbitt, told Cartel and the other attending national BPO providers that the Bank would not take the agent databases because they were not getting into the BPO business.

Cartel was the only national provider willing to join Ocwen's system. Due to its concerns regarding its database, Cartel negotiated a confidentiality agreement with Ocwen Technology to be included in the contract for the use of REALTrans. During these negotiations, Coats and Babbitt worked out a system whereby Cartel's agents would work through a Cartel portal to REALTrans rather than sign up directly on the Ocwen Technology system. Krueger also promised Coats that if he signed on to REALTrans, he would eventually receive 100% of the Bank's national BPO provider business. The contract was executed in March 1999. As soon as the agreement was signed, Cartel began working with Ocwen Tecnology to integrate their systems. Because of problems in the REALTrans connections between Cartel and the Bank, Cartel spent approximately $260,000 on retooling the REALTrans program between 1999 and 2001.

In the meantime, the Bank's business strategy was undergoing a drastic change. At least part of the impetus for the change was the overall corporate plan to capitalize on the efficiencies inherent in the use of the internet and the technology provided by Ocwen Technology. In addition, the loan acquisition business was producing diminishing returns. During the negotiations with Cartel to sign on to REALTrans, Krueger, then manager of the Bank's property valuation department, joined with Babbitt to present a plan to John and William Erbey. Krueger and Babbitt proposed the Bank develop an "in-house BPO shop," eventually eliminating the national providers. (R. Vol. at 3043.) The Erbeys apparently liked the idea because during the first quarter of 1999, the Bank decided to transition out of the loan acquisition business and become a loan services provider. Eventually, in August 1999, the Bank replaced the valuation department with a new division, Ocwen Realty Advisors, and placed Krueger at its head.

Prior to the creation of Ocwen Advisors, in June 1999, Krueger spoke with Ann Gilbert who had been working as one of the Bank's commercial real estate analysts (a loan pool reviewer) since 1998. Krueger discussed the possibility of Gilbert moving to a different position because her current job would be eliminated in the coming business transition. Gilbert became the "manager of vendor management" for Ocwen Advisors. Her job involved vendor recruitment, approving vendors for Ocwen Advisors' use, and vendor file maintenance. In

other words, Gilbert was charged with the development and growth of a national retail vendor network to perform BPOs directly for the Bank — essentially creating the same resource used by the national vendors — to bypass the costs of the middleman. She began by reviewing the vendor list in the Bank's Order Tracking system. Most of those were real estate brokers who performed detailed property analysis for the REO department. She contacted many of these agents but most indicated they were not interested in performing any services, such as an initial BPO, which did not result in receiving a subsequent real estate listing.

Prior to her new position at Ocwen Advisors, Gilbert testified there had been "some efforts" in the company to take agent names off BPOs in the Bank's possession and contact those agents directly, which practice continued through the time she was with Ocwen Advisors. She testified in the early fall of 1999, another national vendor, Market Intelligence, was given a large order. After the orders were received, Ocwen Advisors "started targeting Market Intelligence's brokers." (R. Vol. 7 at 2380-81.) In early November 1999, Gilbert hired a full-time assistant, Kelie Matthews, whose sole responsibility was to recruit vendors to perform BPOs. By early 2000, Matthews reported she had exhausted all her major avenues of recruitment, including the internet, without much success.[7]

---

[7] In January 2000, Gilbert began receiving her paychecks from Ocwen Technology. Ocwen Technology was also intended to start paying the vendors at that time, but the lack of synchronization between the Bank's and Ocwen Technology's billing systems prevented payment from reaching the vendors.

Gilbert worked with Coats as a national vendor and she understood Cartel eventually would be Ocwen Advisors' lead national vendor. In February 2000, Gilbert approached Krueger to suggest the Bank purchase Cartel's agent database. Krueger agreed she should pursue the idea but instructed her not to tell Coats that Ocwen Advisors was building its own retail agent database. Gilbert contacted Coats who expressed interest in the proposition. Although there were several subsequent meetings between Coats and Krueger, Krueger concluded the purchase would be too expensive.

In March 2000, Kreuger called all the managers into his office to inform them he was going to initiate a contest for the staff. He planned to instruct the staff to pull the BPOs provided by national vendors, including Cartel. The staff were to copy the names and telephone numbers of the agents, create spreadsheets and forward the spreadsheets to Gilbert or Matthews. Gilbert testified she lodged an objection to Krueger because she knew most of the targeted BPOs belonged to Cartel. She told Krueger she disapproved of copying the agents' names while Ocwen Advisors were currently in negotiations with Cartel for the purchase of its database.

Despite Gilbert's objection, Krueger issued an e-mail to everyone "on the floor." (R. Vol. 7 at 2371.) The e-mail promised a gift certificate for a free lunch at a local restaurant for the employee with the largest list. After the spreadsheets were sent to Gilbert and Matthews, Matthews eliminated duplicate names and

-13-

divided the remainder among the members of Gilbert's staff. The staff then telephoned the agents to inquire whether the agent was interested in providing direct BPO services for Ocwen Advisors. After receiving and approving the resulting applications, the agents were sent a vendor identification and information regarding fees. A copy of this information was sent to Ocwen Technology. The vendors were also informed that the preferred mode of communication would be REALTrans and they should expect a representative from Ocwen Technology to contact them. Gilbert testified the staff continued to pull names off Cartel's BPOs until her employment with Ocwen Advisors was terminated in November 2000.

Gilbert created reports of the number of retail vendors added each month to the Order Tracking system to keep Kreuger apprised of her progress. The reports indicated Ocwen Advisors added fifty-four vendors in January 2000 and approximately one hundred per month through June 2000. Nonetheless, Ocwen Advisors' database provided in pre-trial discovery reflected only zero to fourteen vendors were added each of those months. Gilbert testified the data could be skewed either because of the Bank's common practice to "back fill" the names of the new vendors to fill in numbers formerly assigned to vendors with which they no longer did business or because the information had been improperly pulled

from the database.[8]  (R. Vol. 7 at 2359.)

In 2000, two circumstances began to affect Cartel's ability to return BPO orders in a timely fashion.  The first involved the use of the REALTrans system.  Unfortunately, the synchronization between Cartel's system and REALTrans did not develop smoothly.  Orders "were getting lost in cyberspace."  (R. Vol. 7 at 2363.)  In addition, Cartel was not permitted to turn down any order issued through REALTrans.  Second, Ocwen Advisors was in the process of building its own retail vendor network.  Because it was easier to find agents in highly populated areas, Ocwen filled those orders with its own agents on REALTrans while it sent Cartel fewer, more difficult orders.  Gilbert discussed these issues with Coats during weekly telephone meetings.

During the summer of 2000, Coats learned Ocwen Advisors may have taken agents' names from Cartel's BPOs.  He received a call from several of his agents stating an Ocwen Advisors' representative had telephoned and asked if they would work directly for Ocwen.  They asked if Coats had given Ocwen their names.  Indeed, Coats got a call personally from an Ocwen Advisors' representative who asked if Coats wanted to be on Ocwen Advisors' database.  He replied he was already listed as a national provider.  Coats then contacted Gilbert to inform her he believed Ocwen was building a retail vendor network and was

---

[8]  These statements were vigorously denied by the Ocwen entities' witnesses at trial.

targeting his brokers. Gilbert relayed this information to Krueger who instructed her: "Don't tell them what we're doing." (R. Vol. 7 at 2380.) Gilbert, Babbitt and Krueger all denied they were taking names off the broker database when asked directly by Coats.

In August 2000, an Ocwen Technology employee sent Coats a copy of the "contest" e-mail issued by Krueger in March 2000. Coats telephoned Gilbert to protest and directed her attention to the confidentiality agreement with Ocwen Technology. At that time, Gilbert informed Coats that Ocwen Advisors was building its own database.[9] Coats also met with Rita Holland, an Ocwen Technology supervisor, to protest the direct use of Cartel's agents. In addition, he spoke with Krueger and Babbitt. In September 2000, Krueger contacted Coats to see if he would be interested in selling Cartel. Negotiations continued into December 2000, at which time Ocwen Advisors decided not to purchase the business. At that point, Coats sent a letter to each Erbey brother and Krueger stating he believed the Ocwen entities had stolen Cartel's agent names in breach

---

[9] William Erbey explained the difference between the Bank's and Ocwen Technology's BPO business. He identified two kinds of BPOs. One type is a "review" BPO where appraisers on staff evaluate the quality of the BPO. The Bank has been in the business of selling review BPOs to Wall Street firms since mid-2000. As of 2004, the Bank would pay an agent or broker approximately $45 to $50 to do the BPO and sell the reviewed BPO for approximately $150. In contrast, the other type of BPO is "unreviewed." The unreviewed BPO is the equivalent of the Cartel product and sells for approximately $70. At trial, Erbey was asked if "any [Ocwen Technology] entity [had] been in the business of doing BPOs." Erbey responded "yes." (R. Vol. 9 at 3203.)

of the confidentiality agreement. By the end of the second quarter of 2001,

Ocwen Advisors completely ceased ordering BPOs from Cartel.[10]

Cartel filed suit against the Ocwen entities on August 21, 2001. After

extensive pre-trial discovery and numerous pre-trial motions, the case went to

trial. At trial, Cartel introduced a comparison of Ocwen Advisors' database,

provided in discovery, with its own. Ocwen's database contained approximately

7,000 names of brokers entered after March 2000, the date of the contest. Of

those 7,000, approximately 3,900 names were marked "prevent use." (R. Vol. 8

at 2695.) Of the remaining 3,100 names designated "use," approximately 1,320

were identical to the Cartel database. (*Id*.) Cartel also introduced the testimony

of Christina Teahan as Cartel's BPO expert and James TenBrook as its damages

expert. Before and during trial, the Ocwen entities objected to the expert

testimony. As to Teahan, Ocwen claimed the jury was not allowed to hear her

testimony since the magistrate had ruled she was unqualified to offer such

opinions. Ocwen objected to TenBrook's testimony alleging it was unreliable and

based solely on speculation. The district court overruled these objections.

As noted earlier, the jury returned a verdict for Cartel against the Bank and

Ocwen Technology. Following vigorous post-trial motions, the district court

---

[10] In 1999, the Bank ordered an average of 3,766 BPOs from Cartel per quarter. In the first quarter of 2000, the Bank ordered 3,365 BPOs. During the remainder of 2000, the Bank ordered an average of 1,732 BPOs from Cartel per quarter. In 2001, the Bank ordered 786 BPOs from Cartel in the first quarter and six in the second quarter.

ultimately determined it had incorrectly allowed TenBrook's testimony and reduced Cartel's recovery based on the Bank's misappropriation of trade secrets to $1 in actual and $1 in punitive damages. Cartel's timely appeal and the Ocwen entities' timely cross-appeal followed.

## II. Cartel's Direct Appeal — No. 04-1502

A. *Damages*

The Colorado Uniform Trade Secrets Act provides for damages for misappropriation of a trade secret as follows: "Damages [for misappropriation of trade secrets] may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Col. Rev. Stat. § 7-74-104(a). "The Colorado Uniform Trade Secrets Act permits plaintiff to recover for both compensatory damages and the defendant's profits from the misappropriation." *Sonoco Products Co. v. Johnson*, 23 P.3d 1287, 1289 (Colo. App. 2001).[11]

_____

[11] Under the Act, "'trade secret' means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."

Colo. Rev. Stat. § 7-74-102(2) defines misappropriation in relevant part as:

> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

Cartel attempted to show damages in the form of the Bank's unjust enrichment as a result of its misappropriation. On appeal, Cartel alleges it showed the Bank benefitted from the misappropriation in two ways. First, by misappropriating Cartel's trade secrets, the Bank was able to side-step the lengthy and time consuming process of locating brokers who would be willing and able to provide BPOs, thereby giving the Bank a head start in competing in the national BPO vendor market. Second, Cartel alleges the Bank was able to decrease its use of national BPO vendors and increase its use of individual brokers.

Under Colorado law, "damages based on mere speculation and conjecture are not allowed. . . . Damages are not recoverable for losses beyond an amount that a plaintiff can establish with reasonable certainty by a preponderance of the evidence. Thus, the plaintiff must submit substantial evidence, which together with reasonable inferences to be drawn therefrom provides a reasonable basis for computation of damages." Sonoco Prod. Co., 23 P.3d at 1289 (quotations

> (I) Used improper means to acquire knowledge of the trade secret; or
> (II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was:
>> (A) Derived from or through a person who had utilized improper means to acquire it;
>> (B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>> (C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .

omitted).  A party "must establish with reasonable, but not necessarily mathematical, certainty both the fact of the injury and the amount of the loss. . . . The damages awarded must be traceable to and [must be] the direct result of the wrong to be redressed."  *Life Care Ctrs. of Am., Inc. v. East Hampden Assoc's Ltd. P'ship.*, 903 P.2d 1180, 1186 (Colo. App. 1995) (quotation omitted).  In other words, Cartel must show the Bank benefitted from the misappropriation of Cartel's information and also establish the amount of the benefit to a reasonable certainty.  The district court determined Cartel failed to prove both factors.

1.  Benefitting from Misappropriation

In its post-trial discussion regarding the admissibility of Cartel's expert witness on damages, the district court identified a "fatal flaw" in Cartel's case.  (R. Vol. 3 at 1080.)  The trial court observed:

> Cartel simply failed to show that the Bank used any identifying broker information, *i.e.* a broker's name and telephone number contained in any single BPO supplied by Cartel, by, for example, bypassing Cartel by contacting that broker and obtaining a BPO from him or her and selling it to a third party, thereby benefitting the Bank through that use of *that particular trade secret*.  Neither Cartel's expert nor any other witness made a connection between any information gleaned from a Cartel BPO to a subsequent contact with a broker by the Bank or a subsequent purchase of a BPO from any such broker by the Bank.

(*Id*.)  The district court continued:

> [I]t does not follow (as a matter of law) that Cartel can claim generally *any* percentage of the Bank's BPO business or profits untethered to the misuse of identifiable broker information provided to defendants by Cartel.  While the number of brokers appearing in both Cartel's and the Bank's databases appears to be as many as

-20-

1356 (and Cartel's counsel intimated there was more), such overlap would have been the starting point for discerning any legitimate basis for damages. The contention that the taking of those trade secrets was somehow instrumental in the formation of the Bank's new BPO database consisting of 62,000 names justifying damages to Cartel of all benefits derived from that database lacks a proper tie between trade secrets misappropriated and benefits derived therefrom.

(*Id*. at 1080-81.)

In its post-trial brief responding to the district court's discussion, Cartel pointed out that Ann Gilbert specifically testified names were taken from the Cartel database and placed into the Ocwen Advisors' database. Coats testified he was personally contacted and several of the brokers appearing on both databases no longer performed work through Cartel for the Bank after the contest. Finally, Cartel addressed the district court's misapprehension that the Bank's database contained 62,000 names, correctly citing the amount at 7,000. It asserted the overlap between the Bank's "use" brokers, (3,000 names), and those identical to Cartel's list, (1,320 names), was a significant misappropriation. Cartel argued this evidence, together, was sufficient for the jury to infer the Bank used Cartel's information to purchase BPOs for a profit.

The district court rejected these argument in its Final Order, stating it did "not deem any lay witness testimony or exhibit to be significant or credible enough to justify further reconsideration as to that claim." (R. Vol. 6 at 1993.) Although the court's post-trial discussion analyzed TenBrook's testimony pursuant to gatekeeper role under *Daubert v. Merrell Dow Pharmaceuticals*, 509

U.S. 579 (1993), the district court's ultimate ruling constitutes an entry of judgment as a matter of law that Cartel failed to provide sufficient evidence the Bank received any gain from its misappropriation. Thus, this aspect of the court's ruling addressed the *traceability* of damages (causation), not the whether the amount was reasonably established by expert testimony.

We review de novo the trial court's determination Cartel's misappropriation damages failed as a matter of law. *See Reeves v. Sanderson Plumbing Prod's. Inc.*, 530 U.S. 133, 150 (2000). Our review encompasses all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, without making credibility determinations or weighing the evidence. *Id.* "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* "In diversity cases, the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate." *Haberman v. The Hartford Ins. Group*, 443 F.3d 1257, 1264 (10th Cir. 2006). Accordingly, the substantive law of Colorado applies and governs as we review the issues raised on appeal.

Cartel's theory of damages, unjust enrichment, is specifically authorized by statute. Colo. Rev. Stat. § 7-74-104. The question before us is whether Cartel presented sufficient evidence for the jury to conclude the Bank was unjustly

enriched by its misappropriation of names from Cartel's list. We must keep in mind, "a directed verdict . . . should be granted only in the clearest of cases." *Park Rise Homeowners Ass'n, Inc. v. Res. Constr.*, 155 P.3d 427, 431 (Colo. App. 2006), *cert. denied, . denied*, 2007 WL 93091 (2007).

The district court determined Cartel's damages claim failed because it had shown no direct evidence of the Bank's use of any name on Cartel's list to purchase and resell a BPO. However, direct evidence is not necessary. A conclusion concerning causation may result from a fact-finder's "reasonable inferences from the circumstantial evidence presented." *Ackerman v. Hilton's Mech. Men, Inc.*, 914 P.2d 524, 527 (Colo. App. 1996). Moreover, contrary to the trial court's post-trial assessment of the significance and credibility of the trial testimony and exhibits, it is the fact-finder who "must resolve conflicts in the evidence and determine the credibility of witnesses and the probative value of the evidence." *Id.* If the jury's conclusion is supported by probative evidence which warrants a reasonable belief in the existence of facts supporting a particular finding, the jury's conclusion is binding on review. *Id.*; *see also Morales v. Golston*, 141 P.3d 901, 906 (Colo. App. 2005), *cert. denied*, 2006 WL 2467851 (2006).

The district court erred in concluding the jury did not have sufficient evidence to reasonably infer the Bank used the names it took from Cartel to purchase BPOs and resell them for a profit. Kreuger testified the Bank did not

have a direct retail vendor list as of Labor Day 1999. Several witnesses testified it would take a significant amount of time to create a profitable national database. Gilbert testified Ocwen Advisors' routine efforts to build a database, including use of the internet, were tapped out by January 2000. She further testified the names taken during the March contest were from Cartel BPOs and were apportioned between staff members who then called to ask the real estate professional to work directly for Ocwen Advisors/the Bank. She stated the company received applications, approved them and added the names to the system. This practice continued through at least November 2000. At the time the Bank's vendor list was provided to Cartel, over one third of the Bank's "use" realtors matched Cartel's list. Moreover, by mid-2000 the Bank's orders to national vendors decreased drastically and orders to Cartel stopped entirely by 2001. Thus, the jury could reasonably infer the Bank used the misappropriated names to contact the agents, purchase BPOs directly, and resell the BPOs.

The district court also determined Cartel had not shown the Bank was "enriched" from the sale of BPOs, *i.e.* no profit was shown. However, Krueger testified he proposed the change in the Bank's business plan to make the division a profit center rather than a cost center and to save money. He testified the Bank was ordering 50,000 to 60,000 BPOs from the national vendors per year and the gross savings/profits from the direct order and resale of 60,000 BPOs would be approximately $2,700,000.00 if the Bank paid $50.00 directly to the vendor and

-24-

resold the BPO for $95.00 to a third party. William Erbey stated, as of 2004, the Bank would pay an agent or broker approximately $45 to $50 to provide a BPO and then sell the BPO for a profit. A reviewed BPO would be sold for approximately $150 and an unreviewed BPO for approximately $70. In any case, the evidence was sufficient for the jury to reasonably infer the Bank's use of the names on Cartel's list generated either a savings or a profit for the Bank, establishing the traceability of the damages.

2. The Amount of the Benefit

We next consider whether there was sufficient evidence for the jury to determine the amount of damages. The primary witness on this issue was TenBrook, Cartel's damages expert. Thus, we must first address the trial court's decision that TenBrook's testimony was unreliable and therefore inadmissible.

The admission at trial of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.[12] *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1078 (10th Cir. 2006). The rule requires a district court to exercise its

_____

[12] Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon,* 389 F.3d 1090, 1098 (10th Cir. 2004) (*quoting Daubert,* 509 U.S. at 589). The district court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1221 (10th Cir. 2003).

Whether the district court applied the proper legal test in admitting an expert's testimony is reviewed de novo. *Id.* at 1223. However, the ultimate decision to admit or exclude expert testimony under *Daubert* is reviewed for abuse of discretion. *Champagne Metals*, 458 F.3d at 1079. The district court's decision will be overturned only if "it is arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (quotations omitted).

Our review of TenBrook's testimony is controlled by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999). As mentioned above, *Daubert* requires a trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. *Kumho* instructs that the "gatekeeping" requirement set forth in *Daubert* "applies not only to testimony

-26-

based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." 526 U.S. at 141 (citation omitted). The court's purpose "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. As an example of a useful factor in a situation where the witness' expertise is based purely on experience, the Supreme Court suggested inquiring "whether [the expert's] preparation is of a kind that others in the field would recognize as acceptable." *Id.* at 151. Here, there is no doubt the district court employed the correct legal test. Consequently, the only question is whether the trial court abused its discretion in discarding TenBrook's testimony after trial.

Cartel proceeded to trial with TenBrook's third expert report in which he based his damages calculation on a theory of unjust enrichment, also described as disgorgement or ill-gotten gains. He calculated 94% of the total number of BPOs purchased by the Bank for each year from 2001 through 2004 reflected the number which would have been purchased from all national vendors during that time. The four-year term was based on Coats' estimate of the time period necessary for the Bank to develop a usable national BPO database. TenBrook then testified that 35% of the total national vendor BPOs was attributable to Cartel but for the misappropriated trade secrets. However, in reaching his estimate of Cartel's damages, TenBrook failed to apply the 35% reduction

attributable to Cartel. Instead, he multiplied the total number of national vendor BPOs by $95.00 — the amount he assumed represented the value of the BPOs sold by the Bank to third party institutions. For his final calculation, TenBrook multiplied the resulting amount by the net profit margin of Ocwen Advisors as reported in the SEC filings of Ocwen Financial Corporation. He concluded the Bank benefitted by $7,487,000.

In its Order granting a new trial on damages, the district court recognized TenBrook's failure to apply the 35% reduction could be easily recalculated, and therefore was not fatal to his testimony. However, the district court determined TenBrook's testimony contained a number of speculative premises and invalid assumptions. Primarily, it found fault with (a) TenBrook's reliance on Ocwen Advisors' net profit percentage reported for the totality of all Ocwen Advisors' product lines, as opposed to the net profitability of the BPO line alone, and (b) TenBrook's use of a four-year term for replicating a viable national BPO database.

a. Apportionment of the Bank's Profit

The district court found TenBrook's reliance on Ocwen Advisors' general net profit percentage, as opposed to the profitability of its BPO line, was improper. Cartel contends the consolidated net profit percentage was the best evidence available because Ocwen Advisors asserted it did not retain records allocating the profits within its product lines. Therefore, according to Cartel, it

could rely on the consolidated information in Ocwen Advisors' SEC filings and the burden of proof apportioning any profit not attributable to misappropriation was Ocwen's.[13]

In *Wynn Oil Company v. American Way Service Corporation*, the Sixth Circuit held the district court abused its discretion when it refused to award damages in a trademark action because the plaintiff could not prove defendant's profits with sufficient certainty. 943 F.2d 595, 607 (6th Cir. 1991). The plaintiff's efforts to ascertain the defendant's profits were frustrated by the defendant's insistence that its profits from the infringement were commingled with other sales and flow-through money and therefore could not be provided in discovery. Based on "common sense" as well as statutory language, the court held the burden of apportioning profits should be placed on the defendants once the plaintiff has proved gains to the defendant from the infringement. *Id*. at 606.

The same premise has been applied in copyright actions. *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1173 (1st Cir. 1994). In *Data*

---

[13] The district court further determined Cartel did not establish profits could be made from the sale of BPOs because it did not present evidence of the profitability of other national vendors and Cartel, itself, lost money from 1999 through 2002. However, the damages theory was not the loss to Cartel, but the benefit to the Bank. The testimony of William Erbey established the Bank bought BPOs for approximately $50.00 and sold them to third parties for anywhere between $90 and $125. (R. Vol. 9 at 3204-05.) He also affirmed the creation of a retail vendor database was a key part of the strategy to turn the new division into a profit center. (*Id*. at 3201-02.) Based on this testimony, the jury could reasonably infer the Bank made a net profit on the sale of BPOs to third parties.

*General*, the First Circuit stated:

> In the context of [a copyright]  infringer's profits, the plaintiff must meet only a minimal burden of proof in order to trigger a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement;  the burden then shifts to the defendant to demonstrate what portion of its revenues represent profits, and what portion of its profits are not traceable to the infringement.

36 F.3d at 1173; *see also Bucklew v. Hawkins*, 329 F.3d 923, 932 (7th Cir. 2003).

*Data General* also recognized this principle has been applied in trade secrets

actions:

> Citing 17 U.S.C. § 504(b) as persuasive authority, the Massachusetts Supreme Judicial Court has set forth the following rule for apportionment in trade secrets cases:  Once a plaintiff demonstrates that a defendant made a profit from the sale of products produced by improper use of a trade secret, the burden shifts to the defendant to demonstrate those costs properly to be offset against its profit and the portion of its profit attributable to factors other than the trade secret. *USM Corp. v. Marson Fastener Corp.,* 392 Mass. 334, 467 N.E.2d 1271, 1276 (1984).  *See also Jet Spray Cooler, Inc. v. Crampton,* 377 Mass. 159, 385 N.E.2d 1349, 1358-59 n.14 (1979) (citing, *inter alia, Sheldon v. Metro-Goldwyn Pictures Corp.,* 106 F.2d 45, 48 (2d Cir.1939), *aff'd,* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940)).

36 F.3d at 1174, n.48.   Comment (f) to the Restatement (Third) of Unfair

Competition § 45 (1995) sets forth a similar burden of proof:

> The traditional form of restitutionary relief in an action for the appropriation of a trade secret is an accounting of the defendant's profits on sales attributable to the use of the trade secret. The general rules governing accountings of profits are applicable in trade secret actions.  The plaintiff is entitled to recover the defendant's net profits.  The plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits.

Ocwen Advisors does not refute that the burden of proof may shift. Rather, it argues the burden never shifted because Cartel did not present sufficient evidence of the fact a sale was made from the misappropriated information. As discussed above, the jury was given sufficient evidence to reasonably infer such profit and the parties do not dispute the fact that the Ocwen Advisors division reported net profits. Therefore, the district court erred in placing the onus on Cartel to provide specific net profits from the sale of BPOs. Ocwen Advisors is in the best position to rationally apportion its net profits between its product streams and the costs associated with its BPO business. Because the absence of evidence is directly attributable to Ocwen's failure to provide the data, it was not unreasonable for TenBrook to apply the same profit ratio for all product lines to one product. *See Electro-Miniature Corp. v. Wendon Co.*, 771 F.2d 23, 27 (2d Cir. 1985) ("Where, as here, there is a clear showing of injury that is not susceptible to exact measurement because of the defendant's conduct, the jury has some latitude to 'make a just and reasonable estimate of damages based on relevant data.'" (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946))).

b. Time Needed to Create National Database

Cartel also claims the district court abused its discretion in excluding TenBrook's testimony based on his assumption that it would take four years to develop a sufficient database. We disagree.

TenBrook testified he used the four-year span because it was his

-31-

assumption "that it would be roughly four years to come up with . . . a minimal database to do what [Ocwen Advisors] wanted to do." (R. Vol. 7 at 2580.) TenBrook stated he based this assumption on his discussions with Coats, which was further substantiated by Gilbert's testimony regarding initial attempts to build Ocwen Advisors' database in 1999 through 2000. Thereafter, the following cross-examination took place:

> Q.     To put this in context, . . . is it not true you didn't conduct any independent investigation to test the information you received from Mr. Coats that it would have taken the Ocwen defendants four years to produce [a] minimal broker database.

> A.     Yes, that's true. I did not conduct an independent review.

> Q.     So you did take the information he gave you at face value?

> A.     Yes. Again, with the substantiating things I talked about.

> Q.     But the information he gave you was the only basis for your inclusion of a four-year period in your calculations, right?

> A.     Yes.

> Q.     You have no independent knowledge, correct, as to how long it takes to develop a minimal broker database?

> A.     No.

(R. Vol. 7 at 2583.)

TenBrook further conceded he did not know how many names it takes to create a minimum database, nor did he know how long it took Cartel to develop a minimum database. He did not ask Coats, who had started doing business with Ocwen shortly after opening Cartel's doors, how he managed to do business prior

-32-

to the four years he suggested it would take to build a minimal broker list. Consequently, TenBrook had no basis for believing a four-year period was an appropriate span for his damage calculations.

Cartel argues it presented other evidence to support this time-frame via the testimony of three national vendors (including Cartel) stating the building of a network "takes years." (R. Vol. 7 at 2262-63, 2303-06, 2308.) Cartel also points to Gilbert's testimony regarding the difficulty Ocwen Advisors had in its initial efforts. While this testimony may establish the difficulty of building a network, it does not provide any information regarding what is necessary for a minimal national database or the time it would have taken a company in 1999 to develop such a database.

Cartel's final justification is the fact TenBrook's analysis was compiled on a yearly basis for four years and, therefore, the jury was free to determine whether one year was an appropriate time span and award damages accordingly. Instead, the jury determined, as a factual matter, four years was an appropriate time frame for damages. This argument misses the point. Assuming the jury could parse the damages from one to four years, it had no information with which it could ascertain whether one or four years was appropriate. The four-year time frame was merely Coats' unsubstantiated suggestion contained and endorsed in TenBrook's calculations. This is insufficient. *See Champagne Metals*, 458 F.3d at 1080, n.4 ("[I]t [is] not 'manifestly unreasonable' for the district court to

conclude that [the expert's] opinions lacked foundation because they were based on 'the self-serving statements of an interested party.'"). Consequently, we find no abuse of discretion in the district court's determination that TenBrook's testimony was speculative and inadmissible. Removing TenBrook's testimony leaves Cartel without evidentiary support for the jury's award of $4,900,000 in actual damages and in turn, eliminates a basis for the proper amount of punitive damages. *See* Colo. Rev. Stat. Ann. § 7-74-104(2) (exemplary damages awarded only after actual damages ascertained)

3.    Remittitur

This brings us to Cartel's claim the district court's decision vacating the misappropriation damages constituted a forced remittitur of damages in violation of the Seventh Amendment right to a jury trial. "A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages." *Johansen v. Combustion Eng'g*, 170 F.3d 1320, 1331 (11th Cir. 1999). "In the usual remittitur situation, a trial judge reviews the jury's verdict in order to determine if substantial evidence at trial supported the amount awarded. If the court finds that insufficient evidence exists, or finds the amount of the verdict a product of jury passion or prejudice, the court then may determine a reasonable amount as plaintiff's damages and allow plaintiff to remit the excess over such amount." *O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir. 1987).

The plaintiff, however, must be given the option of a new trial in lieu of

-34-

remitting a portion of the jury's award. *Id*. The United States Constitution

Seventh Amendment provides, "the right of trial by jury shall be preserved, and

no fact tried by a jury, shall be otherwise reexamined in any Court of the United

States, than according to the rules of the common law." Thus, "[n]o judgment for

a remittitur may be entered without the plaintiff's consent because the Seventh

Amendment prohibits the court from substituting its judgment for that of the

jury's regarding any issue of fact." *Sloan v. State Farm Mut. Auto. Ins. Co.*, 360

F.3d 1220, 1225 (10th Cir. 2004). "[I]f the plaintiff does not consent to the

remittitur, the district court has no alternative but to order a new trial on

damages." *Id*.

Cartel argues the district court erred in ordering a new trial on damages but

then *sua sponte*, without affording Cartel a new trial, entering a judgment in an

amount less than that awarded by the jury based on its weighing of the evidence.

It claims the court's decision amounted to a remittitur in violation of the Seventh

Amendment. The Bank counters that because the reduction in damages was

necessitated by legal error (a failure to prove causation), the reduction is not a

remittitur and a new trial is not required. It relies on the rulings of our sister

circuits holding the Seventh Amendment is not implicated when a damages award

is reduced as a matter of law. *See Corpus v. Bennett*, 430 F.3d 912, 917 (8th Cir.

2005) (allowing a reduction of nominal damages as a matter of law from $75,000

to $1 without a new trial); *Tronzo v. Biomet*, 236 F.3d 1342, 1352 (Fed. Cir.

-35-

2001) (affirming reduction of compensatory damages from $7,134,000 to $520 because there was no legally competent evidence supporting a larger award); *Johansen,* 170 F.3d at 1330-31 (allowing reduction of punitive damages as a matter of law).

The critical question is whether the district court "substitute[d] its own evaluation of the evidence regarding damages for the jury's factual findings" or whether the reduction of damages was based on a "determination that the law does not permit the award." *Corpus*, 430 F.3d at 917. Here, the district court's reduction of damages to $1 in nominal damages rested primarily on its conclusion that Cartel had demonstrated misappropriation, but had presented no evidence linking the misappropriation to a benefit for the Bank. As discussed above, we reach a different conclusion. The trial court also determined, even if Cartel had shown such a link, the testimony of Cartel's expert was unreliable and therefore inadmissible. While TenBrook's reliance on the Bank's reported general net profit for its Ocwen Advisors division was reasonable in the absence of any apportionment by the Bank, his reliance on the four-year time frame was unsupported by any reliable source, leaving the jury to speculate on the extent of damages. As a result, we cannot accommodate Cartel's request to reinstate the jury's award of compensatory and punitive damages.

Nonetheless, we decline to find, as a matter of law, that Cartel would fail to present any evidence of damages should this case be retried. We are informed by

*Morrison-Knudsen v. Fireman's Fund Insurance Company*, 175 F.3d 1221 (10th

Cir. 1999). On appeal from a jury verdict on a contract claim, we concluded the

plaintiff offered no admissible evidence "to support its claim of roughly $1.35

million for attorney's fees," and insufficient evidence "to support its claims for

roughly $3 million in equitable adjustments to the contract" or "the roughly $3.7

million in damages it claimed on behalf of its sub[contractors]." *Id*. at 1242. We

recognized that on remand we could direct an entry of judgment as to those

damages and foreclose the plaintiff from again claiming those items. *Id*. at 1259.

We also conceded a failure to do so would allow plaintiff "a second bite at the

apple." *Id*. Nonetheless, equitable concerns compelled us to allow these issues to

proceed on remand. Our decision was based on the timing of the notice to

plaintiff that its proof was deficient.

> In these circumstances, [plaintiff] had little occasion to try to remedy
> the defects in its proof. Had the court not promptly orally denied
> [defendant's motions], [plaintiff] could have moved for leave to
> reopen its case to provide additional evidence. Giving a party a
> chance to correct defects in proof is a primary purpose of the
> preverdict motion for JMOL under Rule 50(a), and in particular of
> the requirement that the motion specify the grounds for granting
> judgment.

*Id*. at 1259-60 (citing Fed. R. Civ. P. 50(a)(2), advisory committee's note (1991

amend.) (stating the purpose of a requirement for preverdict motion for JMOL "is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked.")). We also noted, "Courts of appeal have often ordered new trials rather than JMOL when a plaintiff could likely remedy its deficient evidence in a new trial." *Id* at 1260.

In this case, as in *Morrison-Knudsen*, the trial was complex and the district court rejected the Bank's pre-verdict motions for JMOL. Given our conclusions that Cartel proved the Bank benefitted from the misappropriation and TenBrook's reliance on multi-product profits was not an unreasonable assumption, the interests of justice require Cartel have a chance to correct its evidentiary shortcomings before reducing the jury's award to only $1 nominal damages. Accordingly, we remand this case for a new trial on misappropriation and punitive damages. Our remand does not, however, disturb the discretion of the district court to determine the extent it would be appropriate to re-open the record or to consider motions for summary judgment. *See Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1450 (10th Cir. 1993) ("The trial court is much more familiar with the conduct of the original trial, the needs for judicial management and the requirements of basic fairness to the parties in a new trial. . . . [I]f a party makes a timely motion to produce new and material evidence which was not otherwise readily accessible or known, the court should, within the exercise of discretion, consider whether denial of the new evidence would create a manifest

injustice. . . . [C]ommon sense should control.").

## II.    Ocwen Entities' Cross-Appeal — No. 04-1517

On cross-appeal, Ocwen Technology maintains the district court erred when it failed to grant JMOL on Cartel's claim that it fraudulently induced Cartel into entering a contract. For its part, the Bank asserts the district court erred in awarding Cartel attorney fees and costs for its Pyrrhic victory on the misappropriation claim. The Bank also argues that, if we remand for a new trial, the new trial should encompass both liability and damages.

A.    *Fraud in the Inducement*

Ocwen Technology claims the district court erred when it denied its motion for a JMOL on Cartel's fraud in the inducement claim. It maintains Cartel did not prove that Ocwen Technology misappropriated Cartel's trade secrets and therefore, the claim must fail as a matter of law. In Colorado, the elements of a fraud in the inducement claim are:

> (1) A false representation of a material existing fact, or a representation as to a material existing fact made with a reckless disregard of its truth or falsity; or a concealment of a material existing fact, that in equity and good conscience should be disclosed; (2) knowledge on the part of the one making the representation that it is false; or utter indifference to its truth or falsity; or knowledge that he is concealing a material fact that in equity and good conscience he should disclose; (3) ignorance on the part of the one to whom representations are made or from whom such fact is concealed, of the falsity of the representation or of the existence of the fact concealed; (4) the representation or concealment is made or practiced with the intention that it shall be acted upon; and (5) action on the representation or concealment resulting in damage.

-39-

*Trimble v. City & County of Denver*, 697 P.2d 716, 724 (Colo. 1985) (en banc).

Ocwen Technology claims Cartel's pleadings rested its fraud in the inducement claim on Ocwen Technology's intentional misappropriation of trade secrets. Because the jury found Ocwen Technology had not misappropriated Cartel's trade secrets, and Cartel must be "held strictly to the pleadings," the fraud in the inducement claim fails as a matter of law. (Cross-Appellant's Br. at 56.) We disagree.

The jury instructions on the fraud in the inducement claim did not require the jury to find Ocwen Technology misappropriated Cartel's trade secrets as a prerequisite to finding Ocwen Technology fraudulently induced Cartel into entering into the REALTrans agreement.[14] Ocwen Technology did not object to this instruction at trial nor does it now claim that the instructions are an erroneous statement of the law. Therefore, this is the law relevant to the fraud claim and the jury's verdict is supported by the evidence.

Ocwen Technology also asserts there was no evidence of any misrepresentation by an Ocwen Technology employee. Rather, it maintains

---

[14] The jury instructions stated that to find Ocwen Technology liable for fraud in the inducement, the jury had to find (1) Ocwen Technology made a false representation of a past or present fact to induce Cartel to enter into the March 19, 1999 contract with an intent not to comply; (2) the fact was material; (3) Ocwen Technology made the representation knowing it to be false or while aware that it did not know whether the statement was true or false; (3) Ocwen Technology made the representation with the intent that Cartel would rely upon it; (4) Cartel justifiably relied upon the representation; and (5) the reliance caused damages.

Cartel demonstrated only that it relied on the representations of the Bank's employees and, therefore, this claim must fail as a matter of law. However, the instructions to the jury combined with evidence adduced at trial makes this a distinction without a difference.

At the close of Cartel's case, Ocwen Technology moved for JMOL on the fraud in the inducement claim. In response, Cartel's attorney stated:

> Remember, also, that the evidence is . . . [Ocwen Advisors] was established in connection with an E-Commerce platform known as REALTrans. And that the E-Commerce platform was being sponsored, if you will, by [Ocwen Technology.] The evidence is that [Ocwen Advisors] was acting hand in glove for the benefit of, and for the promotion of, [Ocwen Technology] and as an agent.

(R. Vol. 8 at 2932.)

The jury was instructed as follows:

> Instruction No. 12
>
> Before one corporation may be held liable for the acts of another corporation, there must be such a close relationship between the two companies that one is, in essence, an instrumentality of the other.

(Supp. Vol. 2 at 693.) Instruction No. 13 further instructed on the factors to determine whether a subsidiary of a corporation is an instrumentality of the parent corporation. No party requested an instruction on factors regarding instrumentality in the context of sister corporations nor did any party request an

instruction regarding an agency theory.[15]  The parties do not complain about the

instructions on appeal and no one claims the instructions were inadequate.  Given

the apparent willingness of the parties to stand on the evidence of the entities'

interrelationships in the context of these instructions, the jury's decision stands.

The evidence demonstrated John and William Erbey were known to be very

active in both the Bank's and Ocwen Technology's business ventures.  Both were

present when Krueger made his pitch to transform the BPO department and it

appears both men gave Krueger the blessing to go forward.  The two entities were

substantially interrelated in promoting the implementation of Ocwen

Technology's REALTrans.  Indeed, Krueger testified he believed he was an

---

[15] It is well-settled that a third party may accept the representations of one who appears to be authorized to act for another.  *Daniels v. Woodmont, Inc.*, 274 F.2d 132, 138 (10th Cir. 1959).  A person need not be an employee to be an agent authorized to act for a principal.  *Grease Monkey Int'l. v. Montoya*, 904 P.2d 468, 473-74 (Colo. 1995) (en banc).

An agent may have actual or apparent authority to act for his principal. *Am. Soc'y of Mech. Eng., Inc. (AMSE) v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982).  "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *Id.* at 566 n.5 (quoting Restatement (Second) of Agency § 8 (1957)). The existence of such authority is a question of fact.  *Grease Monkey*, 904 P.2d at 476.

"Under an apparent authority theory, liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." *AMSE*, 456 U.S. at 566 (quotation omitted).  "[A] plaintiff must establish that the . . . agent was put in a position which enabled the agent to commit fraud, the agent acted within his apparent authority, and the agent committed fraud." *Grease Monkey*, 904 P.2d at 475.

employee of Ocwen Technology from early 2000 through July or August of 2000. Krueger also testified the integration between Ocwen Technology's REALTrans and the Bank's Order Tracking was fundamental to his plan to reorganize the Bank's BPO operations. When Ocwen Technology's REALTrans was introduced, it was Krueger and Bennett who gathered the national vendors to explain the benefits of the Bank's new way of doing business through technology. Taken together, this evidence allowed the jury to reasonably conclude that the Bank was acting as an instrumentality of Ocwen Technology and that Krueger was authorized to act for both entities, especially regarding the purpose and benefits of REALTrans. Consequently, the district court did not err in denying Ocwen Technology's motion for JMOL on this claim.

B.    *Attorney Fees*

The Bank argues the district court erred in awarding Cartel attorneys fees on its misappropriation of trade secrets claim. We review the district court's award of attorney fees for an abuse of discretion. *Homeward Bound, Inc. v. Hissom Mem'l Ctr.*, 963 F.2d 1352, 1355 (10th Cir. 1992). Underlying factual findings will only be set aside if clearly erroneous. *Id.* A district court's statutory interpretation or legal analysis which provides the basis for the fee award is reviewed de novo. *Id.*

The Colorado Uniform Trade Secrets Act (CUTSA) provides:

If a claim of misappropriation is made in bad faith, a motion to

-43-

terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney fees to the prevailing party.

Colo. Rev. Stat. § 7-74-105. Here, the jury concluded the Bank acted in a malicious or willful and wanton manner in connection with its misappropriation of Cartel's trade secrets.[16] Therefore, the Bank concedes the trial court had the discretion under CUTSA to award reasonable attorney fees.

The district court relied in part on our decision in *Nephew v. City of Aurora,* 830 F.2d 1547 (10th Cir. 1987) (attorney fees under 42 U.S.C. § 1988). While *Nephew* was not expressly overruled, *Farrar v. Hobby*, 506 U.S. 103 (1992) (attorney fees under 42 U.S.C. § 1988) and *Phelps v. Hamilton*, 120 F.3d 1126 (10th Cir. 1997) (same), have changed the legal landscape. Whether this is significant is debatable. It is less than clear whether Colorado embraces federal law regarding attorney fees other than in cases involving federally derived rights. *Dennis I. Spencer Contractor, Inc. v. City of Aurora*, 884 P.2d 326, 330 (Colo. 1994) (concluding the Colorado Court of Appeals erred in applying standard for awarding fees under 42 U.S.C. § 1988 to a non-civil rights action). Because the parties cite only federal law on the issue we express no opinion. Since we

_____

[16] CUTSA provides punitive damages "[i]f the misappropriation is attended by circumstances of fraud, malice, or a willful and wanton disregard of the injured party's right and feelings." Colo. Rev. Stat. § 7-74-105. The jury awarded punitive damages against Ocwen Bank on the misappropriation of trade secrets claim. The district court adopted this finding for purposes of concluding that the Act's attorneys fee provision allowed fees in this case.

remand this case to the district court for a new trial on damages, the district court must reassess the question of attorneys fees under Colorado law.

C.    *New Trial*

The Bank maintains a new trial, if ordered, should encompass both liability and damages because the district court erroneously allowed improper opinion testimony which tainted the liability verdict. "The district court is accorded broad discretion in its decision whether to admit expert testimony, which we may reverse only for an abuse of such discretion." *Quinton v. Farmland Indus., Inc.*, 928 F.2d 335, 336 (10th Cir. 1991). The Bank maintains Christina Teahan, Cartel's expert regarding the BPO industry, was allowed to testify beyond her expertise. The Bank also contends the district court improperly allowed lay witnesses Anne Gilbert, Christine Carlso and Rita Holland, to give opinions regarding custom and practice in the BPO industry.

1. Expert Testimony Beyond Expertise

Teahan had worked as a BPO processor for the Bank. She left the Bank to work for another national provider, National Properties Acquisition Consultants (NPAC), managing the BPO process. Eventually, Teahan bought the business and continued to be NPAC's owner at the time of her testimony. Prior to trial, the Bank and Ocwen Technology challenged Teahan's expertise under *Daubert*. A hearing was held before the magistrate judge. At the conclusion of the hearing, the magistrate judge ruled Teahan could testify as an expert regarding the

practices of BPO sellers, such as Cartel, but was not qualified to offer opinions on the practices of BPO purchasers, such as the Bank. Nonetheless, during trial Teahan was asked about practices that occurred while she was working at Ocwen. Specifically, she was asked if she had "an opinion as to whether it was appropriate [for the Bank] to contact the agents who did [Cartel's] BPOs to perform [a] new BPO." (R. Vol. 7 at 2316.) She answered it was not the Bank's "customary practice" to do that. (*Id*.) The Bank objected on the basis of the magistrate judge's ruling, but the district court overruled the objection. Teahan continued to explain her experience at the Bank during the time the company was considering changing due to the increasing interest in e-commerce. She related a conversation with Bill Krueger where she stated it would be inappropriate to take the names off BPOs because a BPO "was not bought for the agent's names." (*Id*. at 2318.)

We agree the form of the question asking her "opinion" regarding what information a BPO *purchaser* believes he is buying went beyond Teahan's expertise as a BPO provider. However, much of her testimony related to her personal experiences at the Bank. This testimony was properly admitted as a background for her actions, such as her conversation with Krueger. In any event, we are convinced the testimony did not taint the liability verdict. The Bank had an opportunity to fully cross-examine Teahan on the limits of her expertise and there was plentiful testimony from other witnesses regarding the confidentiality

-46-

expectations of BPO purchasers and providers.

## 2. Lay Opinion Testimony

The Bank further argues the trial court allowed lay witnesses to opine as experts in violation of Rules 701 and 702 of the Federal Rules of Evidence. In essence, the testimony came from the Bank's and Ocwen Technology's employees who objected to copying names from the national providers' BPOs. Gilbert testified she believed the copying of names was inappropriate and told Krueger her opinion. Christine Carlton, a BPO processor for the Bank who went to work for Cartel after her employment was terminated, testified she believed the confidentiality agreement she signed when she was hired at the Bank required her to protect the confidentiality of the broker names on the BPOs. She testified she "blacked out" agent information when a BPO was sent out of her department. (R. Vol. 7 at 2452.) The deposition testimony of Rita Holland, a former Ocwen Technology employee who had been in charge of vendor relations, was read to the jury. The Bank claims it contained inflammatory and improper lay opinion, but again, the testimony stated Holland's belief the information on the Cartel BPOs was confidential and described her conversation with Krueger relating that belief. Contrary to the Bank's assertions, these witnesses did not testify regarding industry standards.

> Rule 701 [permits a lay witness] to offer opinion testimony only when it is:
> (a) rationally based on the perception of the witness, (b) helpful to a
> clear understanding of the witness' testimony or the determination of

> a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.
>
> Thus, Rule 701 permits the admission of lay opinion testimony provided that it meets two criteria:  a rational basis in perception and helpfulness.  "The perception requirement stems from F.R.E. 602 which requires a lay witness to have first-hand knowledge of the events he is testifying about so as to present only the most accurate information to the finder of fact."  *United States v. Hoffner,* 777 F.2d 1423, 1425 (10th Cir. 1985).

*Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 667 n.12 (10th Cir. 2006).  Here, the testimony of these witnesses, like Teahan's lay testimony, was based on personal experience and personal belief as related to personal actions.  In Carlton's case, she believed the employee confidentiality agreement required her to black out vendor names before allowing a BPO to go outside her department.  Gilbert's and Holland's beliefs led directly to discussions with Krueger regarding the propriety of copying vendor names from BPOs.  The testimony informs the jury as to Krueger's knowledge that several employees disagreed with his position that the agent information on a BPO was not confidential.  *See Gossett v. Oklahoma Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1179 (10th Cir. 2001) ("Courts generally hold admissible under Rule 701 evidence in the form of lay opinion testimony in discrimination cases when given by a person whose position with the defendant entity provides the opportunity to personally observe and experience the defendant's policies and practices.").

In summary, to the extent Teahan's testimony was outside her expertise, its

admission was harmless and did not taint the liability verdict.  The remainder of the testimony identified by the Bank was properly admitted.  We see no reason to order a new trial to determine liability.

### IV.  Conclusion

We **REVERSE** the district court's determination Cartel failed to show the Bank received a benefit from misappropriating Cartel's trade secrets.  We **AFFIRM** the district court's exclusion of TenBrook's expert testimony.  We **AFFIRM** the entry of judgment in favor of Cartel and against the Bank on the issue of liability.  We **REMAND** for a new trial on damages consistent with this Order and Judgment.  Appellees/Cross-Appellants' Motion for Substitution of Party is **DENIED**.  Any adjustment in party status is best determined by the district court on remand.

FOR THE COURT:

Terrence L. O'Brien
United States Circuit Judge