**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 6, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MUSKET CORPORATION,

     Plaintiff Counter Claim Defendant
- Appellant/Cross - Appellee,

v.

STAR FUEL OF OKLAHOMA, LLC,

     Defendant Counter Claimant -
Appellee/Cross - Appellant,

LINCOLN O. CLIFTON; DAVID A.
SELPH,

     Defendant Counter Claimants,

and

MARK LUITWIELER,

     Defendant.

Nos. 13-6133 & 13-6146
(D.C. No. 5:11-CV-00444-M)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

     [*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

Before **LUCERO**, **MURPHY**, and **BACHARACH**, Circuit Judges.

---

Musket Corporation ("Musket") appeals the district court's grant of judgment as a matter of law following a jury verdict in its favor on an implied contract claim. Star Fuel of Oklahoma, LLC ("Star") cross-appeals, challenging the sufficiency of the evidence on several other claims decided in Musket's favor and arguing that the jury's award was duplicative. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part. We conclude that the district court erred in granting judgment as a matter of law on Musket's implied contract claim and remand with instructions to reinstate the jury award. Regarding the issues raised in Star's cross-appeal, we affirm.

# I

The events at issue in this case began while Mark Luitwieler was a regional marketer in Musket's wholesale fuel business.[1] Luitwieler, in April 2008, proposed a risk-sharing agreement to Link Clifton, a principal and co-owner of Star. In an email dated April 4, Luitwieler made the following proposal:

> How about we share the risk on these naked fixed contracts. Ill [sic] buy them when I feel its [sic] right. You sell when it makes sense. We'll split the profits / losses. OR I can pass on all risk to you and ill [sic] just add a penny to each of these and let you move them.

The email referenced two specific fuel contracts.

---

[1] Because this case comes to us on review of an order deciding a motion for judgment as a matter of law, we recite "the evidence and the inferences to be drawn therefrom in the light most favorable to the jury's verdict." Myklatun v. Flotek Indus., Inc. 734 F.3d 1230, 1234 (10th Cir. 2013).

Clifton forwarded the email to Dan Engle, Star's chief financial officer, and Elizabeth Hatcher, who was in charge of wholesale pricing for unbranded fuel at Star, indicating the email was "[f]or your rec's." Engle responded that the arrangement had "inherent risk." He later explained that he was concerned about the arrangement allowing "someone else to make buy decisions for you, when they don't even work for your company."

In the ensuing months, Star and Musket proceeded to split profits on several fuel contracts. In these transactions, Musket would purchase fuel from a third party and Star would re-sell the fuel. On April 14, 2008, Hatcher asked Luitwieler to explain the pricing for one of these transactions. Luitwieler replied that Musket would add approximately one half of a cent to the purchase price Musket paid to account for detergent additive and a product authorization fee. Luitwieler told Hatcher to "sell for the best you can and the [sic] we will split the margin." On April 29, Luitwieler stated that he was going to "call the ball" on another fuel transaction "if everyone agrees." He offered two potential scenarios for the transaction, one in which Musket and Star split profits and another in which the companies split losses. After the transaction resulted in a profit, Engle asked Clifton via email how to split those profits with Musket.

According to forensic accountant David Payne, a majority of the "back-to-back" fuel deals between Musket and Star between March and September 2008 resulted in an

approximately even split of profits.[2]  The profit margin Star reaped on these deals was substantially higher than would be the case in a normal buyer-seller relationship:  a normal "jobber or reseller" would typically reap around one cent per gallon in profit, whereas Star, in that same role, was receiving profits of five or seven cents per gallon. During a period ending July 12, 2008 in which fuel prices were generally rising, Star made $183,758 in profit on these transactions.  Hatcher testified that Star had no intention of sharing in losses, however.

Luitwieler purchased 420,000 gallons of gasoline at $3.4982 per gallon on July 3, 2008.  He believed that the profit-sharing agreement described in his April 9 email was operative, and that he had authority to make this this gasoline purchase.  Shortly thereafter, Clifton told Luitwieler during a telephone call that because the companies had done well on gas trades, they should buy more.  Luitwieler understood this comment as an instruction to purchase additional gasoline under the agreement, and bought another 420,000 gallons at $3.15 per gallon on July 17.

On July 21, Musket employee Kendra Garcia emailed Hatcher and another Star employee, James Roosa, stating that Musket purchased 10,000 barrels of gasoline (420,000 gallons) at $3.155 per gallon, and asked when Star would like to move the fuel. Her email states "Your call-we split the profits."  After the Star employees did not

---

[2] Payne explained that the profits on many of the transactions involving an approximately even split were not divided precisely 50/50.  He treated any profit sharing in which the division was within one half of one cent per gallon to be a splitting transaction, to account for detergent, product authorization, and time charges.

respond, Luitwieler emailed Clifton, asking whether Star would purchase 20,000 barrels at $3.33 on a fixed-price contract. Clifton forwarded the email to Hatcher and Roosa, asking "What the [f]?" At the time, gasoline was selling on the open market for a substantially lower price.

Luitwieler met in person with Clifton, Hatcher, and possibly Roosa (Luitwieler could not recall if Roosa was present) on July 23, 2008. The Star representatives began "back-pedaling" when Luitwieler brought up the 840,000 gallons noted above. Luitwieler explained that the two options would be to sell now and split the losses, or for Star to take the fuel on a fixed-price contract. Because the Star representatives were adamant that they would not accept an immediate loss, and because Hatcher thought the gasoline market had upside because of potential hurricane impact, Luitwieler gathered that there was a "default agreement" to simply hold the fuel. Luitwieler nonetheless told several Musket co-workers that Star agreed to purchase the 840,000 gallons at $3.35 per gallon. He calculated this rate by taking an average of the two purchase prices, adding detergent and product authorization, and adding one cent per month Musket held the fuel.

Around the same time period, Star and Musket were negotiating a settlement agreement to resolve an unrelated dispute over an ethanol terminal venture. Seeking to except the 840,000 gallon fuel deal from the release contained in the settlement, Musket's counsel asked Luitwieler for a copy of the contract. Luitwieler said he had a copy in his files, and stated that the agreement was titled "August fixed price gasoline contract" and had been executed on August 4. On August 15, Luitwieler sent an unsigned copy of this

-5-

contract, stating that he was "98% confident" he had a signed copy. On the same day, Musket sent Star a draft settlement agreement relating to the companies' ethanol terminal dispute. The draft provided for a mutual release but expressly excluded claims related to "that certain August Fixed Price Gasoline Contract dated August 4, 2008." Star and Musket executed the final settlement agreement on September 10, 2008, which included the above-quoted language. However, Luitwieler later admitted that the contract he claimed had been executed on August 4 was actually created on August 15.

Luitwieler's final day of employment with Musket was September 11, 2008. The very next day, he began working for Star to start up their Supply and Logistics Division. Luitwieler had apparently been preparing for the move for some time. His personal calendar included a notation for August 17 in which Luitwieler was set to meet with Clifton and Roosa to "finalize Deal." On August 19, Luitwieler sent an email to his wife stating that Clifton "just called and said I am on. . . . Will get offer tomorrow." On the same date, Luitwieler conducted several Internet searches for methods of transferring data from one laptop to another or from a laptop to the Internet. Luitwieler subsequently downloaded "IDrive" software, which he used to transfer several gigabytes of data from his Musket laptop to an online account between September 3 and 11.

During his first day of employment at Star, Luitwieler executed a contract on behalf of Star under which Star purchased 15,000 barrels of diesel fuel from Musket. Luitwieler also had a conversation with Musket director of supply and logistics Brad Jenkins. Jenkins stated that Musket would go forward with the diesel contract as long as

Star also pulled the 840,000 gallons discussed above. Luitwieler agreed. He contacted Garcia and informed her that Star would pull the gas over the weekend. Garcia sent an email to several Musket employees, and copied Luitwieler at Star, stating: "Okay-Star would like to pull the 20mb of gasoline this weekend in OKC. This was the fuel that was PTO'd into our inventory back in July. We paid 3.3241 for it and Star paid 3.35. Is everyone cool with this?" Jenkins approved the deal, also copying Luitwieler. Although the average market price for wholesale gasoline had fallen below $3 per gallon in early September, it rebounded to $3.36 on September 13.

Luitwieler claimed that Star attempted to pull the gasoline over the weekend but was stymied by a technical error. By September 17, the wholesale gasoline market had plummeted by approximately 50 cents per gallon. Don VanCuren, Musket's director of wholesale marketing, contacted Clifton asking for a signed copy of the gasoline contract. After initially mistaking the contract VanCuren referenced for a different contract, Clifton referred the request to Luitwieler. Luitwieler forwarded Clifton the September 12 email from Garcia.

The following week, VanCuren demanded that Star pull the fuel by the end of September. Luitwieler sent a note to Clifton and Roosa stating that he "fe[lt] terrible about this" and that he "should have just sold it when we had that meeting but, we decided different." On September 24, Luitwieler proposed that Star phase the gasoline purchases over three months, adding a penny to the purchase price for each month of delay. The following day, Jenkins responded that Musket was agreeable. Luitwieler

-7-

asked for Clifton and Roosa's thoughts on the proposal later that afternoon. On October 5, Jenkins sent a contract to Luitwieler with the terms he had offered. Luitwieler forwarded the agreement to Roosa asking for guidance and stating, "I cant [sic] hold them off forever."

On October 16, Clifton told Jenkins that Star would not purchase the gasoline. The price of wholesale gasoline had fallen to less than $2 per gallon by then. After sending a formal demand letter and exchanging additional correspondence, Musket sold the 840,000 gallons to a third party at $1.4075 per gallon, suffering a significant loss.

Musket filed suit against Star, Luitwieler, and Star principals Clifton and David Selph in Oklahoma state court. The case was subsequently removed to federal court. Following discovery, the district court entered partial summary judgment in favor of Star. It concluded that the agreement to purchase 840,000 gallons of gasoline was subject to Oklahoma's statute of frauds, and that the unsigned agreement created by Luitwieler never became effective. The court dismissed Musket's breach of contract claim, along with a related claim for breach of the ethanol terminal settlement agreement. However, the court allowed Musket's breach of implied contract claim to proceed to trial. It also denied a motion in limine to preclude evidence related to the 840,000 gallons from being introduced, explaining that the "Order granting defendant Star Fuel's motion for partial summary judgment specifically and only addressed plaintiff's breach of contract claim relating to the written but unsigned Fuel Purchase Agreement, purportedly dated August 4, 2008" but did not prevent Musket from pursuing "any other claim that might involve

evidence relating to the 840,000 gallons."

The case was tried to a jury in October 2012. The jury returned a verdict in favor of Musket and against Star on several claims in the following amounts: (1) $1,631,700 for breach of implied contract; (2) $11,130 for fraud; (3) $11,130 for constructive fraud; (4) $200,000 for misappropriation of trade secrets; and (5) $200,000 for unfair competition. It also found in favor of Musket and against Luitwieler on several claims.

After trial, Star renewed its request for judgment as a matter of law on several claims decided in favor of Musket. The district court granted the motion in part. It concluded that Musket's implied contract claim was barred by the statute of frauds, and vacated the jury's award as to that claim.[3] The court denied Star's motion as to the remaining claims and entered an amended judgment. Both Star and Musket appealed.

## II

We first consider Musket's appeal. This court reviews de novo a district court's decision on a motion for judgment as a matter of law, applying the same standard as the district court. Murphy Oil USA, Inc. v. Wood, 438 F.3d 1008, 1012 (10th Cir. 2006). Judgment as a matter of law is granted "only if all of the evidence, viewed in the light most favorable to the nonmoving party, reveals no legally sufficient evidentiary basis to find for the nonmoving party." Jones v. United Parcel Serv., Inc., 674 F.3d 1187, 1195 (10th Cir. 2012).

---

[3] Clifton and Selph were also held liable on this claim as guarantors. When discussing this claim, we include Clifton and Selph in referring to Star.

We agree with the district court that Musket's implied contract claim was subject to the statute of frauds absent some applicable exception. "An implied contract . . . is no less within the statute of frauds than is an express contract." GFF Corp. v. Assoc. Wholesale Grocers, Inc., 130 F.3d 1381, 1387 (10th Cir. 1997) (applying Oklahoma law). Under Oklahoma law, which the parties agree applies to this diversity case, "a contract for the sale of goods for the price of Five Hundred Dollars ($500.00) or more is not enforceable" absent a writing that specifies a quantity and is "signed by the party against whom enforcement is sought." Okla. Stat. tit. 12A, § 2-201(1). This Court has recognized gasoline as a good that is subject to the statute of frauds. See Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 687 (10th Cir. 1991). And the gasoline at issue was to be sold for well over $500.

Musket argues that the statute of frauds does not apply because the contract at issue was not one to purchase goods, but rather a risk-sharing arrangement. Musket describes the contract at issue as having two options: under option one, Musket and Star would split the profits or losses on fuel sales; under option two, Star would purchase fuel from Musket at cost plus one cent per gallon and assume all risk. The Oklahoma Supreme Court has held that "[a]n oral agreement to share in the profits and losses arising from the purchase and sale of real estate is not within the statute of frauds." Sperling v. Marler, 963 P.2d 577, 582 (Okla. 1998) (quotation omitted). Comparing by analogy the case at bar to the joint venture alleged in Sperling, Musket contends that the agreement is enforceable absent a writing because it was a risk-sharing agreement rather than a sale of

-10-

goods.

The problem with this argument is that Musket did not argue that Star breached option one of the agreement by refusing to split profits. Instead, Musket argued to the jury that Star was liable because it breached an agreement to purchase the 840,000 gallons of gasoline under option two of the agreement. Even on appeal, Musket acknowledges that option two required Star to "purchase the fuel." Because Musket based its claim on Star's breach of an alleged obligation to purchase gasoline, it is governed by § 2-201(1).

Musket also contends that the district court erred in rejecting its equitable estoppel argument. Equitable estoppel presents a mixed question of law and fact under Oklahoma law. See Oxley v. Gen. Atl. Res., Inc., 936 P.2d 943, 946 (Okla. 1997). Factual questions related to estoppel are for the jury to decide. See Crowell v. Thoreau Ctr., P'ship, 631 P.2d 751, 752 (Okla. 1981). Whether a set of facts gives rise to estoppel is a question of law. See Gen. Fin. Corp. v. Jackson, 296 P.2d 141, 143 (Okla. 1956). To equitably estop a defendant from asserting the statute of frauds, a plaintiff must establish five elements:

> First, there must be a false representation or concealment of facts. Second, it must have been made with knowledge, actual or constructive, of the real facts. Third, the party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts. Fourth, it must have been made with the intention that it should be acted upon. Fifth, the party to whom it was made must have relied on or acted upon it to his prejudice.

Lacy v. Wozencraft, 105 P.2d 781, 783 (Okla. 1940). "[T]he representation or

-11-

concealment may arise from the silence of the party when he is under imperative duty to speak . . . ." Id.

Musket argues that the jury's fraud and constructive fraud verdicts support its equitable estoppel position. By finding in favor of Musket on its fraud claim, the jury determined that Star made a false material representation that it actually or constructively knew to be false with an intent that it be acted upon, and that Musket reasonably relied upon that representation to its detriment. See McCain v. Combined Commc'n Corp. of Okla., Inc., 975 P.2d 865, 867 (Okla. 1998) (listing elements of fraud). And by holding in favor of Musket on its constructive fraud claim, the jury found that Star concealed or failed to disclose a material fact that it had a duty to disclose, that Star did so with the intent to create a false impression upon which Musket would act, and that Musket was injured through reasonable reliance on that impression. See Croslin v. Enerlex, Inc., 308 P.3d 1041, 1045-46 (Okla. 2013) (discussing elements of constructive fraud).

The district court was bound by these findings so long as they were supported by the evidence. "The Seventh Amendment protects a party's right to a jury trial by ensuring that factual determinations made by a jury are not thereafter set aside by the court, except as permitted under the common law." Skinner v. Total Petroleum, Inc., 859 F.2d 1439, 1442-43 (10th Cir. 1988), superseded by statute on other grounds as stated in Guillory-Wuerz v. Brady, 785 F. Supp. 889, 891 (D. Colo. 1992). "If a jury resolves a factual issue, the court may not ignore that determination in fashioning equitable relief or applying an equitable doctrine." Haynes Trane Serv. Agency v. Am. Standard, Inc., 573

-12-

F.3d 947, 959 (10th Cir. 2009) (quotation omitted).  Thus, in making an equitable decision "arising out of the same facts" as a legal claim submitted to the jury, the court must defer to the jury's fact-finding unless that finding is set aside.  Skinner, 859 F.2d at 1444-45.

Taking the evidence in the light most favorable to the verdict, see Myklatun, 734 F.3d at 1234, Star never rejected the risk-sharing arrangement Luitwieler proposed on April 4, 2008.  Instead, Star split profits with Musket on numerous deals over the ensuing weeks, reaping returns much higher than one would expect in a normal wholesaler to reseller transaction.  Despite sharing in these profits, however, Star had no intention of sharing in losses.  Musket purchased the 840,000 gallons at issue believing a risk-sharing agreement was operative.  When faced with a potential loss on the 840,000 gallons, Star and Luitwieler (while working for Musket) elected to hold the fuel hoping that prices would rebound.  After Luitwieler switched companies, he represented that Star would purchase the gas at $3.35 per gallon and even claimed that Star had attempted to pull the fuel on the weekend of September 13, 2008, when prices briefly rose to roughly equal the purchase price.  Over the next month, Musket held the gasoline on the belief that Star had agreed to buy it, even as gas prices plummeted.  Musket would have taken steps to mitigate its exposure to risk had it known Star did not intend to perform.

We agree with Musket that the record supports the jury's finding of fraud and constructive fraud, and that these findings must be applied in assessing Musket's

equitable estoppel argument.[4]  Further, we do not discern a meaningful difference

between the elements of fraud and constructive fraud contained in the jury instructions

and the elements required for equitable estoppel under Oklahoma law.  One of our sibling

circuits has held that proof of fraud necessarily gives rise to equitable estoppel.  See

Lissmann v. Hartford Fire Ins. Co., 848 F.2d 50, 53 (4th Cir. 1988) ("Obviously, if fraud

or deceit were also present, they, being more egregious, would incidentally also create an

equitable estoppel.").  This holding appears consistent with Oklahoma courts' repeated

admonition that the statute of frauds should not be used to perpetrate a fraud.  See, e.g.,

Harris v. Arthur, 127 P. 695, 697 (Okla. 1912) ("[T]he courts will not allow the defense

of the statute of frauds, when in so doing it becomes an instrument for perpetrating a

fraud.  And this is accomplished . . . by holding that the party is in equity estopped from

making use of the statute in his defense."); see also Brown v. Founders Bank & Trust

Co., 890 P.2d 855, 863 (Okla. 1994) (the statute of frauds is "not intended to be used as a

shield or breastwork for a wrongdoer").

The district court did not expressly reject the jury's fraud findings in granting

Star's motion for judgment as a matter of law.  Instead, the court concluded that

"equitable estoppel is an extraordinary remedy and [Musket] has not shown that a

manifest and unconscionable injustice would result if [Star] were not equitably estopped

---

[4] Star briefly suggests that Musket's fraud, constructive fraud, and implied
contract claims were not based on the same set of facts.  However, the Final Pretrial
Report indicates that the claims were based on the same conduct and Star agreed with
that position in its post-verdict motions.

-14-

from relying on the statute of frauds." It reasoned that Star's conduct was no "more than the moral fraud or wrong involved in the repudiation of a contract actually entered into, but which by reason of the statute it is not bound to perform." We hold that this conclusion was legally erroneous.

The dispositive language quoted above comes from St. Louis Trading Co. v. Barr, 32 P.2d 293 (Okla. 1934). There, the court concluded that defendants were not estopped from asserting the statute of frauds as a defense because the plaintiff "fail[ed] to establish an injury resulting from her change of position." Id. at 297. Read in context, the court's insistence that equitable estoppel is appropriate only if "a manifest and unconscionable injustice would result if such relief were withheld," id. at 296, refers to the requirement that a plaintiff suffer prejudice by relying on the representation of the defendant, rather than simply claiming expectation damages. Immediately after the quoted passage, the court explains that plaintiff did not show "injury resulting from her change of position, as distinguished from the damages resulting in [sic] the refusal of the defendants to perform the alleged oral contract." Id. The court stressed that "[t]he very essence of equitable estoppel is the resulting prejudice to the party who invokes the doctrine." Id. at 295. Analyzing case law from other courts, the Barr opinion distinguished between an offer of employment that prompted a plaintiff to quit an existing job, which qualified as "unjust and unconscientious" and sufficient to invoke equitable estoppel, and "the mere moral fraud or wrong involved in the repudiation of a contract." Id.

Several other Oklahoma cases have made the same distinction between

-15-

detrimental reliance and the loss of expected benefits.  In <u>Funk v. Anderson-Rooney</u>

<u>Operating Co.</u>, 423 P.2d 465 (Okla. 1966), the court analyzes several prior cases applying

the rule that a plaintiff must suffer an "unjust and unconscionable" injury by changing his

position to invoke equitable estoppel.  <u>Id.</u> at 468.  It synthesizes the following rule from

these cases:

> [W]here A brings an action against B to recover damages for breach of an
> oral contract . . . and A seeks to eliminate the Statute of Frauds as a defense
> on the grounds of equitable estoppel, the evidence necessary to invoke the
> doctrine of equitable estoppel is measured by the detriment sustained by A
> in acting upon the oral contract or altering his position and not the benefits
> that he would have received under the oral contract.

<u>Id.</u> at 468-69.  Similarly, in <u>Burson v. Whistler's, Inc.</u>, 302 P.2d 155 (Okla. 1956), the

court explained:

> While it has been held in some cases that the doctrine of estoppel is the
> basis of the rule that the statute of frauds cannot be invoked to perpetrate
> fraud, . . . it is commonly held that the word "fraud" as used here means
> actual, positive fraud, and not mere reliance on the honor, word, or promise
> of defendant, and is to be distinguished from the use of the word, in
> connection with equitable estoppel, as synonymous with "unconscientious"
> and "inequitable."  Thus, in order to justify the exercise of equitable
> jurisdiction, the fraud complained of must be something more than the mere
> refusal of a party to perform his agreement, since either party has the right
> to refuse to execute a parol contract within the operation of the statute, and
> the exercise of that right is no more a fraud than a breach of any other
> contract.

<u>Id.</u> at 157 (quotation, citation, and emphasis omitted).

We further note that Oklahoma courts have repeatedly stated the elements of

equitable estoppel without including a requirement that the conduct at issue cause a

manifest and unconscionable injustice.  <u>See, e.g.</u>, <u>McWilliams v. Bd. of Cnty. Comm'rs</u>,

268 P.3d 79, 83 (Okla. 2011); <u>Sellers v. Sellers</u>, 428 P.2d 230, 240 (Okla. 1967). To the extent <u>Barr</u> conflicted with these later-decided cases, we would be compelled to follow the latter. <u>See</u> <u>Wade v. EMCASCO Ins. Co.</u>, 483 F.3d 657, 665-66 (10th Cir. 2007) (in diversity cases, a "federal court must follow the most recent decisions of the state's highest court"). But the better reading of <u>Barr</u>, and the one most consistent with other Oklahoma cases on point, is that manifest injustice refers to the requirement that a plaintiff be meaningfully prejudiced by a change in position made in reliance on a defendant's misrepresentations.

Applying the proper rule to the case at bar, we conclude that Star is equitably estopped from asserting the statute of frauds because of the jury's fraud and constructive fraud verdicts. Musket relied on Star's representations and omissions to its substantial detriment. It purchased 840,000 gallons of gasoline and held them through a period of rapidly declining prices because of Star's fraud and fraudulent concealment. But for that fraud, Musket could have sold the gas on the open market at or above the $3.35 price. Musket lost well over a million dollars in absolute terms, and more than $1.6 million compared to the price at which it would have otherwise sold the fuel. This loss provides the prejudice or "injustice" required by Oklahoma law for the doctrine of equitable estoppel to apply. <u>See</u> <u>Lacy</u>, 105 P.2d at 783-84 (holding that the spending of $6,000 by plaintiff in reliance on oral promise of lease, coupled with defendant's silence, "would result in fraud or other injustice" and thus would trigger equitable estoppel).

In addition to the manifest injustice issue, Star argues in conclusory fashion that

equitable estoppel is inappropriate because Musket had an adequate remedy at law for its injuries. See Barr, 32 P.2d at 296 ("Although equity may intervene for the purpose of preventing this statute [i.e. the statute of frauds] from being used as an instrument of fraud," courts should exercise this equitable power "only in cases where the law does not provide a complete and adequate remedy"). Because the statute of frauds would preclude Musket's contract claim, as noted supra, this rule does not prevent the doctrine of equitable estoppel from applying in this case.

Finally, Star notes that the district court ruled, in support of its position, that punitive damages were unavailable as a matter of law. But under Oklahoma law, a plaintiff seeking punitive damages for fraud "must show the act constituting the cause of action is actuated by, or accompanied with, some evil intent, or must be the result of such gross negligence, such disregard of another's rights, as is deemed equivalent to such intent." Rogers v. Meiser, 68 P.3d 967, 977 (Okla. 2003), superseded on other grounds by Okla. Stat. tit. 60, § 837. We have not been directed to any Oklahoma cases imposing a similar requirement for equitable estoppel.[5]

---

[5] Star raises several alternative arguments attacking the jury's implied contract verdict in addition to its contentions related to the statute of frauds. We are not persuaded by any of these arguments.

Star begins by suggesting that the evidence was insufficient to support the jury's award. But Star did not advance any reasoned argument on this point in its renewed motion for judgment as a matter of law. Accordingly, we will not consider it. See Elm Ridge Exploration Co. v. Engle, 721 F.3d 1199, 1219 (10th Cir. 2013).

Additionally, Star argues that Musket cannot pursue an implied contract claim because it alleged an express contract covering the same subject. But the rule cited by

Continued . . .

The underlying facts of this case were hotly contested. In light of the jury's verdict that Star committed fraud and constructive fraud, however, the district court was bound to apply the findings necessary to support those claims in ruling on Star's motion for judgment as a matter of law. And those findings, absent any apt countervailing argument by Star, compel the conclusion that the doctrine of equitable estoppel bars Star from asserting the statute of frauds. Accordingly, the jury's implied contract award must be reinstated.[6]

### III

### A

Star cross-appeals, challenging the sufficiency of the evidence on several claims. We review de novo the sufficiency of the evidence to support a jury's verdict. Sanjuan v.

---

Star applies only when an express contract is "established," not when one is merely alleged. See Jones v. Univ. of Cent. Okla., 910 P.2d 987, 991 (Okla. 1995). Because Musket's express contract claim was dismissed at the summary judgment phase, Musket was free to argue an implied contract to the jury.

Finally, Star claims that it cannot be equitably estopped because Musket committed fraud. Star argues that it was not obligated to purchase gas bought by Luitwieler, that Luitwieler purchased the 840,000 gallons without Star's knowledge, that Luitwieler falsified documents, and that Luitwieler attempted to complete the purchase of gasoline without Star's consent. But because of the procedural posture of this appeal, we take the evidence in the light most favorable to the jury's verdict. See Myklatun, 734 F.3d at 1234. Star's argument rests on findings contrary to those necessarily made by the jury. Accordingly, we must reject the assertion that Musket defrauded Star rather than vice-versa (as the jury found).

[6] Because Clifton and Selph do not advance any argument challenging their status as guarantors, we also reinstate the judgment as against them.

IBP, Inc., 275 F.3d 1290, 1293 (10th Cir. 2002). We will reverse only if "the evidence points but one way and is susceptible to no reasonable inferences supporting" the verdict. Id. (quotation omitted). "We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for [those] of the jury." Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1546-47 (10th Cir. 1996).

**1**

Star contends that the evidence was insufficient to support the jury's verdict on Musket's fraud claim.[7] To prevail on its fraud claim, Musket was required to prove that: (1) a false material representation was made as a positive assertion; (2) it was known to be false or made recklessly without knowledge of the truth; (3) there was an intention it be acted upon; and (4) the other party relied on the representation to its detriment. McCain, 975 P.2d at 867. The mere failure to perform is insufficient—there must be clear and convincing evidence that the promise was made with the intent not to perform. Citation Co. Realtors, Inc. v. Lyon, 610 P.2d 788, 790 (Okla. 1980).

As noted supra, the record fully supports the jury's findings of fraud. Star accepted an even split of profits on several deals apparently in conformance with Luitwieler's proposal, yet, as Star employee Hatcher acknowledged, the company had no intention of splitting losses. Luitwieler later represented on behalf of Star that it would

---

[7] Star also argues that the jury's fraud verdict was prohibited by the statute of frauds. Because we have concluded that Star is equitably estopped from asserting the statute of frauds, we do not address this argument.

purchase the 840,000 gallons at issue, causing Musket to hold the gasoline instead of selling it under favorable market conditions.  Clifton knew of this latter representation by September 23, 2008.

Star focuses on the issue of whether Musket's reliance was reasonable.  See State ex rel. Sw. Bell Tel. Co. v. Brown, 519 P.2d 491, 495 (Okla. 1974) (under Oklahoma law, reliance must be justifiable).  It points to several statements from Musket employees expressing concern over Luitwieler's integrity and questioning why Star would pay more for the 840,000 gallons than the market price.  The employee who questioned why Star would engage in the transaction explained that he was unaware of the profit-sharing deal at the relevant time.  And several employees testified that although they were concerned about Luitwieler generally, they had no reason to doubt the existence of a risk-sharing agreement with Star.  The jury was free to accept these explanations and weigh these witnesses' credibility.  We are bound by their determination on that score.  See Harolds Stores, Inc., 82 F.3d at 1546-47.

**2**

Star also challenges the sufficiency of the evidence to support the jury's constructive fraud award.  "Constructive fraud is the concealment of a material fact by one who has a duty to disclose."  Howell v. Texaco, Inc., 112 P.3d 1154, 1161 (Okla. 2004).  Star contends that Musket failed to establish a duty to disclose because the transaction at issue was an ordinary commercial exchange.  But a duty to disclose can exist absent a fiduciary duty or other special relationship "if a party selectively discloses

-21-

facts that create a false impression." Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165, 1181-82 (10th Cir. 2008) (applying Oklahoma law). By accepting split profits following Luitwieler's proposal without disclosing that Star did not intend to split losses, Star created a false impression and was thus liable for constructive fraud.

**3**

We next consider Star's argument that the evidence was insufficient to support the jury's misappropriation of trade secrets award. "To prove misappropriation of a trade secret, [a plaintiff] must show (i) the existence of a trade secret, (ii) misappropriation of the secret by defendants, and (iii) use of the secret to [the plaintiff's] detriment." MTG Guarnieri Mfg., Inc. v. Clouatre, 239 P.3d 202, 209 (Okla. App. 2010).

Star contends that Musket failed to establish that it misappropriated or used any of the documents taken from Musket by Luitwieler. We have no trouble concluding the evidence was sufficient to show that Star misappropriated the documents at issue.[8] Oklahoma law defines misappropriation as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Okla. Stat. tit. 78, § 86(2)(a). And the phrase "improper means" includes "breach of a duty to maintain secrecy." § 86(1). By bringing Musket's documents to Star, Luitwieler breached a non-disclosure agreement. And the jury permissibly concluded that Star should have known that Luitwieler, a director recently hired from a

---

[8] Star does not challenge the existence of trade secrets.

similar position at another company, was subject to non-disclosure duties.

Relying on non-Oklahoma cases, Star argues that "use" means "commercial use." See, e.g., Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 539 (5th Cir. 1974). Assuming commercial use is required under Oklahoma law, we conclude that Musket provided enough circumstantial evidence to support the jury's verdict. A computer forensics investigator testified that numerous Musket documents, including those identified as trade secrets, were downloaded from Luitwieler's IDrive account from computers associated with Star. Several Musket customers identified in files taken by Luitwieler began doing business with Star, and Star's wholesale fuel business increased significantly after Luitwieler was hired. The jury permissibly inferred that the documents at issue were commercially used by Star, particularly in the absence of any potential non-commercial use for the files.

Star also claims that the jury's verdicts are inconsistent because it found in favor of Luitwieler on Musket's misappropriation claim against him. However, Musket presented evidence suggesting that Star employees other than Luitwieler accessed the Musket documents. Multiple Star computers accessed the IDrive account, including a computer in Kansas City and one in Oklahoma in the span of eighty minutes. Moreover, the Oklahoma Supreme Court has explained that "[u]nder respondeat superior, the negligence or wrongful act, as opposed to the civil liability of the servant, is imputed to the master. . . . [A] finding of no civil liability on the part of the servant does not necessarily negate the liability of the master." Hooper ex rel. Hooper v. Clements Food

-23-

<u>Co.</u>, 694 P.2d 943, 945 (Okla. 1985) (emphasis omitted).

Finally, Star argues that Musket's damages expert impermissibly attributed all of the profits of Star's supply and logistics division to trade secret misappropriation. However, under the "traditional form of restitutionary relief in an action for the appropriation of a trade secret," the "plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits." <u>Cartel Asset Mgmt. v. Ocwen Fin. Corp.</u>, 249 F. App'x 63, 79 (10th Cir. 2007) (unpublished) (quoting <u>Restatement (Third) of Unfair Competition</u> § 45, cmt. (f) (1995)). Having elected to forgo apportionment evidence, Star cannot now complain of the damage award.

**4**

In its final sufficiency of the evidence challenge, Star claims that the evidence was insufficient to establish unfair competition for several reasons. First, it claims that Star and Musket were not competitors. Although Musket's president testified that the two companies were not competitors as to Musket's "primary business," he and several other witnesses testified that the two companies did compete in the wholesale fuel business.

Second, Star contends that Musket failed to show that it lost customers or that Star deceived any customers. However, the jury instructions do not contain either of these requirements. Star did not specifically object to the instructions given by the court on that basis and does not challenge the instruction on appeal. "In a civil case each party

-24-

must live with the legal theory reflected in instructions to which it does not object."

Black v. M & W Gear Co., 269 F.3d 1220, 1232 (10th Cir. 2001); see also Eller v. Trans

Union, LLC, 739 F.3d 467, 480 (10th Cir. 2013) ("A party who objects to an instruction

must do so on the record, stating distinctly the matter objected to and the grounds for the

objection." (quotation and alteration omitted)); Hynes v. Energy W., Inc., 211 F.3d 1193,

1200 (10th Cir. 2000) (general objection that instruction is inaccurate insufficient).

Because Star did not properly object below and does not challenge the instruction on

appeal, we will not consider its argument that the evidence was insufficient to support an

element that did not appear in the instruction. See Malandris v. Merrill Lynch, Pierce,

Fenner & Smith, Inc., 703 F.2d 1152, 1176 n.20 (10th Cir. 1981).

Star also repeats the inconsistency argument it advanced as to the

misappropriation of trade secrets verdicts. As with that claim, the jury found in favor of

Musket on its unfair competition claim against Star, but in favor of Luitwieler on

Musket's unfair competition claim against him. We reject this argument for the same

reasons stated supra.

**B**

Star further argues that the jury's verdict impermissibly awarded duplicate

damages. "This court will only disrupt a jury verdict for duplication if the verdict amount

is not within the range of evidence." Morrison Knudsen Corp. v. Ground Improvement

Techniques, Inc., 532 F.3d 1063, 1079 (10th Cir. 2008). "[A] verdict will not be upset on

the basis of speculation as to the manner in which the jurors arrived at it." Midwest

Underground Storage, Inc. v. Porter, 717 F.2d 493, 501 (10th Cir. 1983). "[E]ven where the chance is slight that the jury arrived at the award without erroneously duplicating," a verdict that is "within the range of the evidence" must be upheld unless it "cannot be explained by evidence in the record and duplication is apparent." Morrison Knudsen Corp., 532 F.3d at 1079.

The jury awarded $200,000 on both the unfair competition and misappropriation of trade secrets claims. It awarded $11,130 on both the fraud and constructive fraud claims. Star notes that these claims were based on the same overall conduct, but does not contend that the awards were beyond the range of the evidence. The jury was instructed on the differing elements of each claim. Star offers mere conjecture that the jury duplicated its awards as to these different claims. We will not speculate that duplication occurred merely because the awards are equal. See Macsenti v. Becker, 237 F.3d 1223, 1234-35 (10th Cir. 2001).

IV

For the foregoing reasons, we **REVERSE** in part and **REMAND** with instructions to reinstate the jury's verdict on Musket's implied contract claim as to Star, Clifton, and Selph. We otherwise **AFFIRM**. We **GRANT** Musket's Motion to Strike Sections I and II of Star's Reply Brief. See Naimie v. Cytozyme Labs., Inc., 174 F.3d 1104, 1113 n.8 (10th Cir. 1999) (striking portions of reply brief addressing issues not raised in cross-appeal); Fed. R. App. P. 28.1(c)(4) (permitting cross-appellant to file a reply "limited to the issues presented by the cross-appeal"). Musket's motion to file Volume 36 of

Appellant's Appendix under seal, which was provisionally granted, is hereby

permanently **GRANTED**.


Entered for the Court



Carlos F. Lucero
Circuit Judge